THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| DEBORAH HATCH, ) | |
| ) | |
| Plaintiff, ) | MEMORANDUM DECISION |
| vs. ) | AND ORDER |
| ) | |
| WASATCH COUNTY, et al., ) | Civil No. 2:10-cv-01204-DS |
| ) | 2:12-CV-00673 (Consolidated) |
| Defendants. | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## I. INTRODUCTION

In her Amended Complaint Ms. Hatch alleges that while an inmate at Wasatch County Jail she was subjected to acts of sexual harassment and assault by Wasatch County Deputy Sheriff Chris Epperson who was assigned to work in the jail.

Defendants Wasatch County, former Jail Commander Sue Winterton, and former Sheriff Kenneth Van Wagoner move for summary judgment (Doc. #116) on all of Ms. Hatch's claims against them.

The Amended Complaint contains two claims for relief relevant to the present motion. In the Second Claim of the Amended Complaint, brought pursuant to 42 U.S.C. § 1983 for deprivation of Hatch's rights against cruel and unusual punishment under the Eighth Amendment, she generally alleges that Ms. Winterton, as jail commander, was responsible for inmate safety, that she knew of Epperson's misconduct, but failed to properly supervise and train jail personnel, and failed to implement and enforce policies relating to sexual harassment and sexual contact between jail personnel and inmates,

resulting in injury to her. The claim against Winterton is brought in both her individual and official capacities.

The Fourth Claim, likewise, is bought pursuant to § 1983. Ms. Hatch sues Wasatch County and former Sheriff Kenneth Van Wagoner for deprivations of rights under the Eighth Amendment. She generally alleges that those defendants, aware of Epperson's misconduct, failed to properly supervise and train jail personnel and failed to implement policies relating to sexual harassment and sexual contact between jail personnel and inmates, resulting in injury to her. The claim against former Sheriff Van Wagoner is brought in both his individual and official capacities.

Plaintiff now concedes that Sheriff Van Wagoner may be dismissed. *See* Mem. Opp'n at 2 ("Plaintiff agrees that the claims against Sheriff Von [sic] Wagoner should be dismissed").

## II. SUMMARY JUDGEMENT STANDARD

Under Fed. R. Civ. P. 56, summary judgment is proper when the pleadings, affidavits, depositions or admissions establish there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party.[1] *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). This burden has two distinct components: an initial burden of production on the moving party, which burden when satisfied shifts to the nonmoving party, and an ultimate burden of persuasion, which always

---

[1]Whether a fact is material is determined by looking to relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242.

remains on the moving party.  *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (2d ed. 1983).

The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*.  If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact on his claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.  *Celotex*, 477 U.S. 242.

"[T]he burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id*., 477 U.S. at 325.  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (alteration and internal quotation marks omitted).

### III.  DISCUSSION

Section 1983 provides a private cause of action for a person subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law.  42 U.S.C. § 1983.  The Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement" and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted).

### A. 42 U.C.S. § 1983 - Wasatch County (Fourth Claim)

Ms. Hatch's § 1983 claim against Wasatch County and Sheriff Van Wagoner is predicated on assertions that those defendants knew of Epperson's conduct through Winterton, but failed to properly supervise and train jail personnel, and failed to implement and enforce policies relating to sexual harassment and sexual contact between jail personnel and inmates.[2]

Local governments are not vicariously liable under § 1983 for their employees' actions. *Connick v. Thompson*, 563 U.S. 51, 60 (2011)   Therefore, "[a] municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff. *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)). A local governmental entity may be liable "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person to be subjected to such deprivation." *Connick*, 563 U.S. at 60 (citing *Monell*, 436 U.S. at 692). The Tenth Circuit recently summarized the law regarding § 1983 municipal liability.

> To establish municipal liability on a § 1983 claim, **a plaintiff must show that "the municipality itself cause[d] the constitutional violation at issue".** *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). We have identified **three elements to such a claim: "(1) official policy or custom, (2) causation, and (3) state of mind**." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). **An official policy or custom may take many forms, including "a formally**

---

[2] Defendants correctly assert that a suit against Winterton and Van Wagoner in their official capacity is in reality a suit against Wasatch County. *See e.g. Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *Myers v. Okla. County Bd. Of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) (official capacity claim against the sheriff is the same as a suit against the county).

4

> **promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision.**" *Id*. At 770. This requirement is intended to limit the municipality's liability to acts for which it is actually responsible, not merely those of its employees. *Id*.; *see also City of Canton*, 489 U.S. at 385, 109 S. Ct. 1197 ("*Respondeat superior* or vicarious liability will not attach under § 1983."). **Causation may be established if the plaintiff shows "the municipality was the moving force behind the injury alleged**." *Schneider*, 717 F.3d at 770 (internal quotation marks omitted). "**Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied**." *Id.* (internal quotation marks omitted). Finally, to show that "a facially lawful municipal action has led an employee to violate a plaintiff's rights," the plaintiff must show that the action "was taken with deliberate indifference as to its known or obvious consequences." *Id*. (internal quotation marks omitted). **In the context of a "failure to train" claim under § 1983, even a showing of gross negligence by the municipality is inadequate to meet the state-of-mind requirement**. *City of Canton*, 489 U.S. at 388 & n.7, 109 S. Ct. 1197.

*Blueberry v. Comanche County Facilities Authority*, 672 Fed. Appx. 814, 816-17 (10th Cir. 2016) (emphasis added).

### 1. official policy or custom (and its "many forms")

In support of her § 1983 claims, Ms. Hatch asserts in conclusory fashion that "[i]n the absence of policies and training, Epperson was able to sexually harass [her] without intervention for a period of about six months, and was then able to escalate that harassment into sexual assault." Mem. Opp'n at 21.

### a. policy

Uncontroverted factual evidence reflects that Wasatch County had relevant governing polices in effect during the time in question.[3]

Ms. Hatch's attempt to create a disputed issue of fact as to whether a policy existed by citing deposition testimony of Susan Winterton that there was no policy falls short. *See* Mem. Opp'n at 21. The passage cited, at most, reflects that in Winterton's view there was a policy in place but outdated. *See* Winterton Dep. p. 11, Mem. Opp'n, Ex. 3. *See also* Winterton Decl. at ¶ 3 ("During my tenure, Wasatch County Jail policies prohibited familiar or personal relationships and any sexual relations or sexual conduct between inmates and

---

[3] *See, e.g.,* Epperson Decl. ¶ 4 ("During the time I worked at the Jail, Wasatch County policies prohibited familiar or personal relationships with inmates."); Bonner Decl. ¶ 10. ("Epperson ... signed receipt of the personnel manual which clearly describes the sexual abuse policy at Wasatch County Jail. 'Staff members will not become physically or romantically involved with prisoners. Staff Members will not violate any of the provisions of [UCA] 76-5-412, the Custodial sexual relations - Custodial sexual misconduct act.'"); Bonner Decl.¶ 11 ("During the year 2010, Wasatch County Jail policies prohibited any familiar or personal relationships, sexual relations, or sexual conduct of any kind between inmates and Wasatch County Jail employees."); Second Bonner Decl. ¶ 7 ("During the time of the alleged incidents, while Lt. Winterton was working on updating the jail policies, the jail was continually operating under the prior policies and standards."); Second Bonner Decl. ¶ 9 ("The policies regarding sexual harassment, interactions between jailers and inmates, and sexual conduct between jailers and inmates were policies that were still in effect during the relevant time period in 2009-2010, and were not being updated during the time of the allegations.") Second Bonner Decl. ¶¶ 1,3 (POST training participants "receive training regarding sexual harassment and working with arrestees and inmates of the opposite gender.").

Wasatch County Jail employees.").[4]   Without factual support Hatch conclusorily denies that Epperson received training on relationships with prisoners by Peace Officer Standards and Training ("POST").[5]

### b. training

It is undisputed that Mr. Epperson was certified as a Correctional Officer by Utah POST. Sheriff Bonner, who is familiar with POST training states that participants "receive

---

[4] Plaintiff also asserts that "Epperson repeatedly complained about the lack of clear policy and procedure within the jail, including complaints about being in inappropriately sexually charged circumstances with inmates." Mem. Opp'n at 10. In support, she relies on the following statement by Epperson: "I complained to my supervisors that female inmates were placing me in what I felt were inappropriate sexually charged circumstances. My jail supervisors listened to my complaint but took no action." Epperson Aff. ¶ 7. Epperson's statement does not support Hatch's position that clear policy was lacking, that supervision or training was deficient, or that Wasatch County was on notice of Epperson's misconduct.

Hatch's reliance on Epperson's complaint to Jared Rigby, likewise, is misplaced. See Mem. Opp'n, Ex. 4. The referenced documents pertain to Winterton's management style and interaction with jail employees, but make no reference to policy. Neither do the documents provide Wasatch County any notice of Epperson's misconduct.

[5] It defies all credulity that such training was not part of correctional officer training and POST certification.

7

training regarding sexual harassment and working with arrestees and inmates of the opposite gender."[6] Second Bonner Decl. ¶¶ 1,3.

Hatch's reliance on Epperson's statement that he received no formal training while with the County falls short of creating a disputed issue of fact. Mr. Epperson does not state that he did not receive any training, only that he did not receive "formal training", which he does not define.[7] POST Academy graduates "must complete a minimum 40 hours training every year that includes issues such as corrections operations, appropriate supervision of prisoners, and sexual harassment on a routine and ongoing basis." Bonner Decl. ¶ 6. *See also* Mem. Opp'n at 7-8 (admitting the same).[8] And it is unrefuted that Epperson also

---

[6]The Court also agrees with Wasatch County that "law enforcement officers need not implement policies or be trained specifically not to engage in criminal conduct such as sexual assault because such misconduct is obviously forbidden for any certified officer." Mem. Support at 15. *See Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 774 (10th Cir. 2013) (quoting *Barney v. Pulsipher*, 143 F.3d 12991308 (10th Cir. 1998)) ("'[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior'"). *See also id* (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996)) ("'In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women'").

[7]*See* Epperson Aff. ¶ 6, Mem. Opp'n, Ex. 2,( "During my years at the Wasatch Sheriff's office, I never received any formal training in the area of sexual harassment, nor was I formally instructed as a male deputy jailer in dealing safely and correctly with female inmates on sexual issues.")

[8] Hatch's denial that Epperson did not actually receive such training based on his "formal training" statement is insufficient to place the issue in dispute. As discussed, Epperson denies only that he received formal training, not that he received other training. And contrary to Hatch's assertion, Winterton did not testify that there was no additional policy or training on male deputy/female inmate interaction once POST training was completed. She testified only that she was unaware of any, or couldn't recall any. *See* Winterton Dep. pp. 23-25, Mem. Opp'n, Ex. 3.

would have received training from a Field Training Officer, which "is on-the-job training for deputies"[9], and that personnel records establish that he received sexual harassment training on March 13, 2008. Bonner Decl. ¶¶ 8-9.

### c. custom or practice

Relying on a hearsay based statement by Epperson that he was informed of two incidents of inappropriate sexual relationships between sheriff's office employees,[10] Hatch also asserts that the "jail had a wide spread custom" of a "sexually charged atmosphere". Mem. Opp'n at 17.

The incidents referenced did not involve jail inmates and there is no suggestion that they occurred at the jail. And even if admissible and relevant to the alleged facts here, two incidents can hardly be said to be a wide spread custom.

Ms. Hatch also argues that " [g]iven the long history of sexual harassment and assault at the jail" the "recurring situation for male guards at Wasatch County Jail to be alone with female inmates in areas of the jail that are not being watch [sic] by other guards or by camera surveillance", and "the length of time" Epperson's alleged conduct continued, the potential threat to inmates was obvious. Mem. Opp'n at 22.

---

[9] Hatch's summary denial that Epperson did not actually receive such on-the-job training based on his "formal training" statement, see note 7, is insufficient to place the issue in dispute. As discussed, Epperson denies only that he received formal training, not that he received other training.

[10] See Epperson Aff. ¶ 5, Mem. Opp'n, Ex. 2 ("Soon after I was hired, I was informed that there had been a male deputy who had an inappropriate sexual relationship with another deputy employee. In addition, it was reported to me that one of the senior deputy sheriffs had an inappropriate physical relationship with a subordinate female dispatcher working at the sheriff's office.")

9

The evidence does not support such an assertion. As noted, Hatch has not established that there is a long history of sexual harassment and assault at the jail. And while there was no written policy on the subject of surveillance free zones, it is undisputed that training was provided to jail personnel on that very issue. *See* Rigby Dep. pp 43-46. Likewise, such training was part of the corrections officer POST training. Winterton Dep. pp. 23-24.[11]

### d. deliberately indifferent supervision

The premise of Ms. Hatch's failure to supervise and failure to implement appropriate policies claim is that Wasatch County, through Winterton, knew that there was an obvious risk that she would be sexually harassed and/or assaulted by one of her jailers, but failed to protect her. Hatch alleges that Epperson inappropriately searched her on September 4, 2010, and that was the first day he physically touched her. She further alleges that Epperson sexually assaulted her in the Commissary a day or two after the September 4th incident. Ms. Hatch states that she "reported the incidents to her [state] caseworker on September 9, 2010[12], attempted to report them to Winterton that same day, and made written requests to speak to Winterton and the Sheriff in the following weeks." Mem. Opp'n at 6. She also claims that during that same meeting with her state case worker Winterton

---

[11] *See also Hovater v. Robinson*, 1 F. 3d 1063, 1066 (10th Cir. 1993) ("[I]n order to determine that a constitutional violation could have occurred, we must conclude that a male guard having sole custody of a female inmate creates such a risk to her safety that it constitutes a violation of the Eighth Amendment's cruel and unusual punishment clause. We are unable to do so.).

[12] The state case worker, Mr. Ron Herbert, denies that Hatch told him about Epperson's conduct toward her.

was standing outside the attorney-client room listening to the conversation. Hatch Dep. 84:2-22.

The facts reflect that neither Wasatch County, Sheriff Van Wagoner, or Winterton had any knowledge of Epperson's alleged conduct until after the events alleged occurred and Epperson was no longer at the jail.[13] Epperson's last shift at the jail was on September 7, 2010.[14] Epperson Decl. ¶ 5, Rigby Dep. pp 13-14. Although Epperson has admitted to sexually assaulting Ms. Hatch, there is no viable evidence that Wasatch County or any

---

[13] See Second Bonner Decl. ¶ 14 ("In the case of Mr. Epperson, although he was no longer working in the Jail because he was at the POST Law Enforcement Academy when allegations against him were discovered, he was immediately put on administrative leave, pending a full investigation. He was terminated on November 2, 2010 when the investigation was completed.").

[14] Although Hatch states that she saw Epperson in the jail after September 7, 2010, she references the time she saw him as being about the time Epperson had a baby. See Hatch Dep. p. 113. It is undisputed that Epperson's baby was born on June 11, 2010. Epperson states that September 7, 2010, was the last time he worked at the jail, that he began attending the POST Academy on September 13, 2010, and that he did not return after that date. Epperson Decl. ¶ 5. Continuing on the payroll for a brief period and being present at the jail are not the same. Accordingly, his statement that he was employed with Wasatch County from November 2007 to November 2010, has not been shown to be contradictory. See Epperson Afff. ¶ 3, Mem. Opp'n, Ex. 2.

of its supervisors were aware of Epperson's misconduct with her, or any other inmate, until after Epperson was no longer at the jail.[15]

### 2. causation

To prevail on her § 1983 claim, Hatch also must "'demonstrate a direct causal link between the municipal action and the deprivation of federal rights'". *Schneider,* 717 F.3d

---

[15] Hatch's conversation with her state case worker in the jail's attorney-client room, which she claims Winterton overheard, occurred September 9, 2010, after Epperson was no longer at the jail. In any event, Hatch provides no foundation for how she could know that Winterton was listening to her conversation with her state case worker, other than she saw Winterton and another officer talking outside the attorney-client room. She states that when she walked out of the room, Winterton said something about a heated conversation or asked her about what was going on. Hartch Dep. at pp. 84, 87. That does not present a triable issue of whether Winterton had notice of Epperson's conduct. Winterton states that she never heard the conversation between Hatch and Herbert. Winterton Decl. ¶ 7. Hatch admits that she did not tell Winterton about Epperson's conduct on that occasion, but instead requested to speak with her, Mem. Opp'n at 4, which Winterton denies. A request to speak with Winterton is not notice to her of Epperson's alleged sexual misconduct. Likewise, her alleged request to speak with Sheriff Bonner is not notice to Bonner of Epperson's conduct. Mr. Herbert, the state case worker, was not a Wasatch County employee and Hatch fails to explain how notice to Herbert, who denies any such conversation, constitutes notice to Winterton or Wasatch County.

Hatch also asserts that Winterton must have had knowledge of Epperson's misconduct from some unknown third party because prior to October 18, 2010, Winterton confronted her on road crew and asked if there was a sexual relationship between them. It is undisputed that Hatch did not tell Winterton anything at that time. The date of any such conversation was after Epperson left the jail.

Hatch also relies on Winterton's testimony that there were rumors of potential misconduct by Epperson. However, Winterton states that she did not learn of those rumors until the first or second week of October, 2010, after Epperson was no longer working at the jail. Winterton Dep. p.19.

at 770 (quoting *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).[16] That she has failed to do. Epperson's alleged conduct was clearly contrary to Wasatch County's policy and training. Hatch has pointed to no constitutionally deficient policy, training or supervision of personnel that directly caused or led to any deprivation of her rights. In short, Hatch has failed to successfully dispute those facts which reflect that relevant policies were in place during the time of the alleged conduct, that supervision and training were constitutionally sufficient, and that no harm to her was directly caused by Wasatch County.

---

[16] See also Schneider, 717 Fed. 3d at 770 (citations and internal quotation marks omitted)
> To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right. This requirement is satisfied if the plaintiff shows that the municipality was the moving force behind the injury alleged.

### 3. state of mind

There is no viable evidence that Wasatch County had knowledge, either actual or imputed constructive knowledge, of Epperson's conduct prior to the acts alleged. Neither is there evidence that Wasatch County or its supervisors consciously or deliberately disregarded any substantially certain or obvious risk that Epperson would sexually harass and/or assault Ms. Hatch, or that her constitutional rights would otherwise be violated. As noted, Hatch's conclusory statements to the contrary are unsupported by factual allegations and do not present triable issues of fact. In short, Ms. Hatch also has failed to successfully place in dispute facts sufficient to establish that Wasatch County acted with deliberate indifference.[17]

---

[17]As explained by the Tenth Circuit:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortuous conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Bryson v. City of Oklahoma City,* 627 F. 3d 784, 789 (10th Cir. 2010) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998)), *cert. denied*, 564 U.S. 1019 (2011).

## B. 42 U.C.S. § 1983 - Winterton (personal capacity) (Second Claim) [18]

In a personal capacity § 1983 suit against a local government official, liability must "be predicated on a violation traceable to a defendant-official's 'own individual actions.'" *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (citation omitted).

> The plaintiff therefore must show an affirmative link between the supervisor and the constitutional violation. This requires, for example, more than a supervisor's mere knowledge of his subordinate's conduct. This notion is embodied in the three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation, and (3) state of mind.

*Schneider*, 717 F.3d at 767 (internal quotation marks and citations omitted).

### 1. personal involvement

The exact contours of what personal involvement are required in the Tenth Circuit

---

[18] As discussed, any claim against Ms. Winterton in her official capacity is treated as a claim against Wasatch County.

15

presently appear to be somewhat unclear.[19] No analytical difficulty is presented here, however, because no evidence suggests Winterton's personal involvement in Epperson's conduct in any fashion. Plaintiff's individual capacity claim against Ms. Winterton is based on a theory of failure to train and supervise and failure to implement and enforce policies to protect her against Epperson's conduct. As discussed, no viable evidence reflects that Winterton had any knowledge of Epperson's conduct until after the harm alleged had occurred and Epperson was no longer at the jail. It is undisputed that Winterton did not authorize or directly participate in any sexual harassment and/or assaults on Hatch. And Plaintiff fails to successfully dispute evidence that relevant policies and constitutionally adequate training and supervision were in place.

---

[19]*See Schneider*, 717 F.3d at 768, (internal quotation marks and citations omitted)

> Before the Supreme Court's decision in [ *Ashcroft* v.] *Iqbal*, [566 U.S. 662 (2009)] this circuit allowed a plaintiff to establish personal involvement in several ways, for example, by demonstrating [a defendant's] personal participation, his exercise of control or direction, or his failure to supervise. A defendant supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement.
>
> *Iqbal*, however, articulated a stricter liability standard for this first element of personal involvement. In *Iqbal*, the Supreme Court explained that because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

*See* also *Cox v. Glanz*, 800 F.3d 1231, 1248-49 (10th Cir.2015) (internal quotation marks omitted) ("[a]dmittedly, [t]he contours of ... supervisory liability are still somewhat unclear after [the Supreme Court decided] *Iqbal*, which articulated a stricter liability standard for ... personal involvement").

.          **2. casual connection**

"A plaintiff [must] establish the requisite causal connection by showing the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Schneider*, 717 F. 3d at 768 (internal quotation marks omitted). No viable evidence reflects that Winterton was presented with an obvious risk of constitutional harm to Hatch which she ignored. And no triable issues of fact support such a conclusion in this case.

**3. state of mind**

Exactly what state of mind is required to impose individual liability depends on the specific claim. *See Schneider*, 717 F.3d at 769 (applying deliberate indifference standard to § 1983 action alleging sexual attack by police officer).[20]  "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Id.* (internal quotation marks omitted). No triable issues of fact support the conclusion that Winterton was deliberately indifferent.

**C. Qualified Immunity - Winterton**

Defendants assert, that "[e]ven if the court may find a question as to whether Winterton violated Plaintiff's rights, she may still be entitled to Qualified Immunity." Reply

---

[20] *See also Dodds v. Richardson*, 614 F.3d 1185, 1196 n.4 (10th Cir. 2010), *cert denied*, 563 U.S. 960 (2011):

> In *City of Canton v. Harris*, 489 U.S. 378, 388 ... (1989) the Supreme Court held that 'the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." After *Canton*, "deliberate indifference or reckless disregard" became the primary governing standard for supervisory liability.

17

Mem. at 12. Having concluded that Winterton is entitled to summary judgment on Hatch's § 1983 claim against her, the Court does not address Winterton's qualified immunity defense.

## IV. CONCLUSION

For the reasons stated, as well as generally for those set forth in their pleadings, the Motion for Summary Judgment (Doc. #116) of Wasatch County, Susan Winterton, and Kenneth Van Wagoner is granted.

IT IS SO ORDERED.

Dated this 3rd day of August, 2017

BY THE COURT:

_____
DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT